Michael E. COOPER, Naval Air Facility,
Andrews Air Force Base, Maryland,
Petitioner,

v.

Arthur BARKER, Commander, Naval Air
Facility, Andrews Air Force Base,
Maryland,
and
Paul Ignatius, Secretary of the Navy,
Pentagon, Washington, D. C.,
Respondents.

Civ. No. 19817.

United States District Court
D. Maryland.

Oct. 29, 1968.

David N. Webster and Williams & Connolly, Washington, D. C., for petitioner.

Stephen H. Sachs, U. S. Atty., and Alan I. Baron, Asst. U. S. Atty., Baltimore, Md., for respondents.

HARVEY, District Judge:

Michael E. Cooper is a 23-year-old enlisted man in the United States Navy assigned to Andrews Air Force Base in Maryland. He has filed a petition in this Court under 28 U.S.C. § 2241(c) claiming that he is a conscientious objector and seeking the issuance of a writ of habeas corpus which would have the effect of granting him a discharge from the Navy.

## Background

Petitioner voluntarily enlisted in the Navy in February of 1963. After serving satisfactorily for two years, he re-enlisted for a six year term in March, 1965, and is now a Petty Officer with the rank of Aviation Electronics Technician, Second Class (E–5). Both his wife and mother were Jehovah's Witnesses, and in December of 1966 he started attending Jehovah's Witnesses' bible classes in Lexington Park, Maryland. In time he fully embraced the tenets of this religious sect including opposition to war in any form, and on March 4, 1968, he filed an application for a discharge as a conscientious objector under Department of Defense Directive (hereinafter D.O.D.) No. 1300.6, effective August 21, 1962.[1]

Until the adoption of these regulations, an individual who became a conscientious objector after entering the service was afforded no special treatment or relief. Although 50 U.S.C.App. § 456 (j) recognized the special status of conscientious objectors before induction into the Armed Forces and granted those qualifying an exemption from military training and service, the protection of this statute did not apply to those enlisted or inducted personnel already in the armed services. See Brown v. Mc-Namara, 263 F.Supp. 686, 691 (D.N.J. 1967), affirmed 387 F.2d 150 (3rd Cir. 1967), cert. den. Brown v. Clifford, 390 U.S. 1005, 88 S.Ct. 1244, 20 L.Ed.2d 105 (1968). D.O.D. No. 1300.6 stated that Congress deemed it more essential to respect a man's religious beliefs than to force him to serve in the Armed Forces and provided that consistent with this national policy "bona fide conscientious objection by persons who are members of the Armed Forces will be recognized to the extent practicable and equitable." Procedures were established whereby a serviceman might apply for a discharge as a conscientious objector. The Navy adopted implementing regulations of its own, Bureau of Naval Personnel Manual Article C–5210.

In accordance with the applicable procedures, Commander R. E. Osmond, who is the Senior Chaplain at the Naval Air Station at Patuxent, Maryland, where petitioner was then stationed, interviewed petitioner and submitted a report dated March 4, 1968 concluding that petitioner was sincere in his religious beliefs and that his position was "not just a stand to avoid further military duty." As a part of the administrative file the Commanding Officer at Patuxent Naval Air Station likewise interviewed petitioner and added his endorsement stating that in his opinion petitioner was sincere in his religious beliefs and concluding that his further service would not be in the best interests of the Navy. Although D.O.D. No. 1300.6 did not require an advisory opinion by Selective Service in the case of an applicant with more than two years service, petitioner's application was then referred to the Director of the Selective Service System.[2] General Hershey thereupon advised the Bureau of

---

1. As required by these regulations, petitioner executed and filed with his application a statement acknowledging that any discharge as a conscientious objector would bar him from certain Veterans Administration rights to which he would otherwise be entitled.

2. According to the Under Secretary of the Navy in his letter of November 4, 1965 to the Chairman of the Armed Services Committee of the House of Representatives, no Selective Service advisory opinion was required for personnel who have completed two years or more of active service. However, according to Section V.C. 3 of the regulations, advisory opinions may be sought as to applicants with two or more years of service at the discretion of the military department concerned.

954

Naval Personnel that petitioner would not be classified as a conscientious objector if he were being considered for induction at that time. On May 22, 1968, the Chief of Naval Personnel disapproved petitioner's application for a discharge.

Petitioner immediately took steps to ascertain what he might do to seek reconsideration or appeal of this decision. He discussed his case with legal counsel for the Jehovah's Witnesses, and thereafter personally went to the Pentagon and attempted to see the Chief of Naval Personnel. Eventually, after being referred to a Lieutenant Sexsmith of the Bureau of Naval Personnel, it was suggested to him that he file as an appeal a revised application supplying new and additional evidence in support of his position.

Thereupon, petitioner submitted on June 10, 1968 a revised application requesting a reconsideration of the Navy's earlier action. Attached to such application were various affidavits of the presiding minister and of other members of the Congregation of Jehovah's Witnesses in Lexington Park, Maryland, attesting to the sincerity of his religious beliefs. He likewise attached Selective Service Form 150, being the form used by a registrant for the draft who claimed to be a conscientious objector. This form was either filled out by petitioner or incorporated by reference various portions of his earlier application.

With his revised application was submitted a report by the Chaplain at Andrews Air Force Base,[3] stating that an interview had been held with petitioner and that in such Chaplain's opinion, petitioner was sincere in his convictions. Also submitted was an endorsement from the Commanding Officer of the Naval Air Facility at Andrews forwarding the file to the Chief of Naval Personnel for appropriate action. Another statement was executed acknowledging his disentitlement to Veterans Administration benefits, if discharged as a conscientious objector.

On May 10, 1968, the Department of Defense had adopted new regulations dealing with the administrative discharge of conscientious objectors from the armed services. These new regulations, which were also known as D.O.D. No. 1300.6 and which became effective on June 10, 1968, made certain revisions in procedures to be followed in cases involving in-service claims for conscientious objector discharge.

In particular, an applicant was given an opportunity to appear in person before an officer in the grade of O–3 or higher, who was knowledgeable in policies and procedures relating to conscientious objector matters. Section VI.B.4. Such officer, after conducting a hearing and making other appropriate inquiries, was directed to enter his recommendation and the reasons therefor into the file. Section VI.B.4.a.

Between June 10 and July 14, 1968, petitioner checked at least twice a week with the Bureau of Naval Personnel in an endeavor to ascertain what action was being taken in connection with his revised application. During this period he was not told that he was entitled under the new procedures effective on June 10, 1968 to have a hearing before a Naval officer who would make a recommendation in his case. Nor until after this proceeding was filed was such a hearing scheduled.

On July 14, 1968, petitioner addressed a letter to the Chief of Naval Personnel advising that "in his view of the length of time that my appeal has been undergoing consideration, it is obvious that an agreement between me and you is not forthcoming." He further stated that he would no longer compromise his faith by serving in the armed services and that on July 17, 1968 he would refuse to wear his uniform. He further stated that he would be attending an assembly of Jehovah's Witnesses in Washington until

**3.** On June 3, 1968, petitioner had been detached from service at Patuxent and assigned to the United States Naval Air Facility at Andrews Air Force Base, Maryland, to report not later than June 14, 1968.

July 22, 1968, on which date the Navy could pick him up at home if it wished.[4]

Petitioner did indeed refuse to report for duty on July 18, 1968. He was apprehended by the Shore Patrol on July 23 at his home and, when returned to Andrews Air Force Base, refused to obey an order of a Naval officer that he put on his uniform. Thereafter, a pretrial investigation was undertaken to determine what court-martial charges would be lodged against him. A report was submitted by Lieutenant Commander William C. Murphy recommending that under the Uniform Code of Military Justice petitioner be charged with desertion under Article 85 and with wilfully disobeying a superior officer under Article 90. 10 U.S.C. §§ 885, 890. The maximum penalty for the Article 85 charge is 3 years imprisonment and a dishonorable discharge, while the maximum for the Article 90 charge is 5 years and a dishonorable discharge. 10 U.S.C. § 856 and Manual for Courts-Martial (1951 Ed.). In his report Lieutenant Commander Murphy said the following:

> "This is no ordinary case of a trouble maker or consistent disciplinary problem type sailor going over the hill. It involves a man who is from his record a good Navy man, and one who heretofore wore his Naval uniform with pride. It concerns a man who has a sincere conviction and belief that military service and wearing the military uniform is in direct opposition to his religious tenets. He is a man who tried through channels to be separated from the service based on his conscientious objection to it."

On August 21, 1968, petitioner filed a petition for a writ of habeas corpus in this Court.[5] Pursuant to a show cause order, the government filed an answer alleging that a hearing in regard to the reconsideration of petitioner's application for a discharge as a conscientious objector was scheduled by the Navy for September 5, 1968. In its answer, it was further stated by the government that "the entire process can be in all probability completed on or before September 25, 1968."

On September 19, 1968, Lieutenant Commander Murphy submitted a report to the Bureau of Naval Personnel stating that a hearing was held that day at which petitioner and his attorney appeared. This was the hearing required by the new D.O.D. No. 1300.6, effective June 10, 1968. The hearing officer incorporated the following opinion and conclusion in his report:

> "4. Opinion: Petty Officer COOPER is competely sincere in his belief that based on religious reasons he cannot participate in war of any form. On this subject he is articulate, but not glib. He has a vast knowledge of the Bible and it has been through his study of the Bible that he has reached his decision. His absolute faith and belief in God has led him to this decision. The decision was not a light one or a hasty one. His sincerity is beyond question.

> "5. Conclusion: I consider that this is not a problem of a borderline sailor trying to beat his way out of the service on a phony, trumped up reason. It relates to a young man, who was a good service man, who developed a genuine belief that made service abhorrent to him. It is recommended that Petty Officer COOPER be discharged from the U. S. Navy by reason of conscientious objection to war in any form."

On September 20, Captain Arthur Barker, Jr., the new Commanding Officer of the Naval Air Facility at Andrews

---

4. Included in his letter was the following statement:
   "I will not try to hide or in any way refuse to be placed in jail if that is your alternative."

5. Subsequent to his arrest, petitioner has at no time been confined in a stockade or other place of military detention. His orders are to report to the Legal Officer each day and remain there during duty hours. On week-ends he is permitted to leave the base and go home.

Air Force Base, submitted to the Bureau of Naval Personnel the report of the hearing officer together with the following statement:

"The Commanding Officer has had interviews with Cooper and concurs with the opinion of the hearing officer that Cooper is sincere in his beliefs."

In spite of the suggestion by the government in this case that a final administrative determination by the Navy might be made on or before September 25, no such decision had been reached by September 30. Instead, the Navy scheduled a general court-martial for October 2, 1968, so that petitioner might be tried for the charges pending against him. As it was apparent that if the court-martial proceedings went ahead, petitioner might receive a dishonorable discharge which would render moot his pending petition for a writ of habeas corpus, this Court entered a 10-day temporary restraining order dated September 30, 1968 staying the court-martial proceedings. The response of the Navy was to reschedule the general court-martial for October 16. By October 10, the administrative proceedings had still not been completed. Accordingly, the temporary restraining order was continued, and on October 18 a hearing was held to determine if a preliminary injunction should be issued.

At such hearing, the evidence indicated that the Bureau of Naval Personnel had declined to process to final determination the petitioner's application because of the pendency of the court-martial proceedings. A preliminary injunction was entered on October 18, 1968 staying the court-martial proceedings until final disposition of this matter and setting this case down for hearing on October 24.

### Discussion

■ The federal courts have traditionally been loath to interfere with matters that are legitimately the concern of the armed services. As the Supreme Court said in Orloff v. Willoughby, 345 U.S. 83 (1958), at pages 93–94, 73 S.Ct. 534, at page 540, 97 L.Ed. 842:

"We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service."

This principle has been applied in two very recent decisions of this Court. In Weber v. Clifford, 289 F.Supp. 960. (Decided September 20, 1968), Chief Judge Thomsen dismissed the complaint of a 19-year old soldier with a history of rheumatic fever which sought to set aside an Army order requiring him to proceed to California for assignment in Vietnam, on the grounds that the Court had no jurisdiction to review a determination made by Army doctors. In McAbee v. Martinez, 291 F.Supp. 77 (Decided October 14, 1968), Judge Thomsen again declined to take jurisdiction of an action brought by members of an Army reserve maintenance unit scheduled for deployment to Vietnam who claimed that they had not received adequate training for overseas duty. These cases, as did Orloff, dealt with specific assignments to duty.

■ However, a number of recent decisions emanating from various circuits have recognized that in a case such

as the present one not involving a duty assignment a federal district court may review action taken by military authorities which violates their own established regulations. Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968); Brown v. McNamara, 387 F.2d 150, 152 (3rd Cir. 1967); Dunmar v. Ailes, 121 U.S.App. D.C. 45, 348 F.2d 51, 53 (1965); Crane v. Hedrick, 284 F.Supp. 250 (N.D.Cal. 1968). In particular just as a selective service classification of a draft registrant claiming conscientious objector status can be reviewed in a habeas corpus petition, Witmer v. United States, 348 U.S. 375, 377, 75 S.Ct. 392, 99 L.Ed. 428 (1955), so may the denial by the armed services of an application by a serviceman for a discharge as a conscientious objector under D.O.D. 1300.6 be subjected to judicial review. Hammond v. Lenfest, supra, (Navy reservist); Brown v. McNamara, supra, (Army enlistee); In the Matter of Kelly, 401 F.2d 211 (5th Cir. decided August 30, 1968), (Army inductee);[6] Crane v. Hedrick, supra; (Navy enlistee). But, see Noyd v. McNamara, 267 F.Supp. 701 (D.Colo.1967), affirmed 378 F.2d 538 (10th Cir. 1967), cert. den. 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967).

■ The applicable scope of review in such a case is the limited "no basis in fact" standard used in the judicial review of selective service classifications. Hammond v. Lenfest, supra. See United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) and Estep v. United States, 327 U.S. 114, 122–123, 66 S.Ct. 423, 90 L.Ed. 567 (1946). Under such a test, this Court must determine whether there was any basis in fact for the Navy's conclusion that at the time of filing his request for a discharge Petty Officer Cooper would not have been classified as a conscientious objector if he were being considered for induction by the Selective Service System.

■ After a careful consideration of the testimony and exhibits, this Court concludes that the record before it, in the words of Judge Kaufman in the Hammond case (398 F.2d at p. 717), "does not contain a scintilla of evidence challenging the sincerity or depth" of Cooper's conscientious objector beliefs or that these beliefs ripened after he entered the service. Two Navy Chaplains and three of petitioner's commanding officers have all found him to be sincere in his religious convictions opposing war. Another Naval officer, purportedly knowledgeable in conscientious objector matters, found that petitioner had a vast knowledge of the Bible obtained through study and that an absolute faith and belief in God had led him to the decision that he could not participate in war in any form.

It is not contended by the Navy here that petitioner should not have been granted a discharge because it would not have been practicable or equitable to do so. The Navy instead suggests that petitioner was insincere in his application because in October of 1967 he applied for and was denied a discharge for physical reasons. Petitioner in his revised application candidly admitted that he had tried this approach to avoid undue publicity and personal censure because of his religious views. Lieutenant Commander Murphy in his report mentioned the earlier application for a medical discharge and did not find that it cast any doubt on petitioner's sincerity of belief.

The Navy further suggests that the opinion of General Hershey furnishes some basis in fact for its action. How-

6. In the *Kelly* case, the Court viewed the question of judicial review as one based on principles of comity. However, the Navy's action in the pending case would also be reviewable under the test established in the Fifth Circuit, namely, whether a "petitioner's application for discharge as a conscientious objector under the regulations could be facially so convincing, and the factual allegations of withholding or frustration of the right to seek discharge could so clearly present constitutional issues crying out for judicial scrutiny, that the military should, as a minimum, be required to show cause why a writ should not be issued."

ever, unlike all six of the Naval officers who recommended that petitioner be discharged, General Hershey did not personally interview him. Furthermore, no reason was given by General Hershey for his conclusion that petitioner would not have been classified as a conscientious objector if he were being considered for induction.[7] Nor has the government produced any evidence either in the administrative file or otherwise disclosing a basis in fact for General Hershey's advisory opinion.[8] Under these circumstances, such opinion provides no factual basis for the Navy's action in denying on May 22, 1968 petitioner's application for a discharge. This Court therefore concludes that such action was arbitrary and without a basis in fact. In view of petitioner's outstanding service record up until May 22, 1968, he was as a bona fide conscientious objector, entitled on that date to an honorable discharge for the convenience of the government.

The facts of this case are strikingly similar to those in Crane v. Hedrick, supra. There an apprentice seaman had filed an application seeking a discharge as a conscientious objector under D.O.D. No. 1300.6. Because of an adverse opinion by General Hershey, his application was denied. He thereafter refused to obey certain orders and left his ship without permission just prior to its departure for Vietnam. In granting habeas corpus relief and discharging petitioner, the District Court examined the documents before the Navy and found that there was no basis in fact for the denial of petitioner's application for a discharge. The Court said the following (284 F.Supp. at p. 255):

"* * * [T]here could have been no doubt as to his sincerity. Both his

commanding officer and his chaplain attested to it. There were no contrary statements. It is well established that, even under the basis in fact test, doubt as to sincerity cannot be predicated upon 'mere speculation'. See Dickinson v. United States, supra [346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953)]."

In this case the Navy has not pressed the claim that this Court may not review the denial by the armed services of an application by a serviceman for a discharge as a conscientious objector. Rather, it is contended that as a matter of law the petitioner has failed to exhaust available remedies within the military by presenting his conscientious objector claim as a defense at his pending court-martial proceeding. It is argued that this Court should decline to exercise jurisdiction in this case and permit the matter to be resolved by the Navy by going ahead with the pending court-martial proceedings including any appeals and then by completing the administrative processing of the revised application.

The reported cases have recognized the requirement that a serviceman must first exhaust his available remedies under D.O.D. No. 1300.6 before seeking habeas corpus relief in the federal court. Hammond v. Lenfest, supra, 398 F.2d at page 714; United States ex rel. Mankiewicz v. Ray, 399 F.2d 900 (2d Cir. 1968). However, the remedy that must be exhausted is an *administrative* remedy. In *Mankiewicz*, the Court sent the case back to the Department of the Navy with directions that the application of the petitioner for a discharge as a conscientious objector be processed and determined in accordance with the applicable regulations. The Court further directed that

---

7. In his report of September 19, 1968, Lieutenant Commander Murphy noted that petitioner's original application had been turned down "for some reason".

8. At the hearing in this case, the Court requested the Navy to produce the administrative file in the office of the

Bureau of Naval Personnel relating to its denial of petitioner's original application. The Court was informed that the Navy took the position that the file would not be produced because it contained privileged matter.

the pending court-martial proceedings be deferred until after such a determination was made. In the *Hammond* case, a petition for a rehearing was filed after the *Mankiewicz* decision was handed down on July 16, 1968. In a supplementary opinion filed on August 26, 1968, the Court remanded the case to the Department of the Navy with directions that the petitioner's application be processed in accordance with the newly adopted regulations, D.O.D. No. 1300.6, effective June 10, 1968. 398 F.2d, at page 718.

■ With the requirement of exhaustion in mind, this Court did not set this case down for immediate hearing in view of the government's representation in its answer that the administrative processing of petitioner's revised application would be completed by September 25, 1968. However, it soon became apparent that the Navy was refusing to complete processing and was insisting instead that court-martial proceedings of petitioner be completed first.[9] Under these circumstances, this Court holds that there has been no failure by petitioner in this case to exhaust his available administrative remedies because the Navy has refused to permit him to do so.

The government further argues that the petitioner has not exhausted his available remedies because the court-martial proceedings are still pending and that this Court should not act on the pending petition until after petitioner has been tried in the pending general court-martial proceedings. A similar argument was rejected by Judge Kaufman in the *Hammond* case, 398 F.2d at page 714:

"Where the exhaustion doctrine is applied, as in the state prisoner example,

the petitioner has already committed the act for which he is to be punished. The remedy that must be exhausted— such as an application for a writ of *coram nobis*—is a true 'remedy'; unlike a court martial, it affords the possibility of relief but does not subject the applicant *to the risk of the imposition of additional sanctions*. It is noteworthy that an inductee can challenge his classification by the Selective Service System without subjecting himself to the risk of imprisonment or other penalties. He can either refuse induction and present his allegedly improper classification as a defense in a criminal trial or he can submit to induction and petition for a writ of habeas corpus. Witmer v. United States, 348 U.S. 375, 377, 75 S.Ct. 392, 99 L.Ed. 428 (1955). In the latter event, he does not risk criminal penalties. If, on the other hand, we analogize a court martial to an administrative rather than judicial remedy, there is even less reason to require Hammond to be court martialed on the facts of this case. 'When there is nothing to be gained * * * the courts have not been reluctant to discard [the exhaustion of administrative remedies] doctrine.' Wolff v. Selective Service, supra, [2 Cir.] 372 F.2d at [817] 825. Compare Townsend v. Zimmerman, 237 F.2d 376 (6th Cir. 1956) (Judge, now Justice, Stewart) (action to enjoin induction)." (Emphasis added)[10]

■ Here not only would petitioner risk the imposition of additional sanctions in the court-martial proceedings, but if such proceedings were held he could further receive a sentence of a dis-

9. In a letter to petitioner's attorney dated October 15, 1968, Admiral Duncan, Chief of Naval Personnel, stated that the Navy was suspending final action on petitioner's application until his court-martial action had been concluded.

10. In a dissenting opinion filed in *Hammond* and in a concurring opinion filed in *Mankiewicz*, Judge Friendly indicated that in circumstances such as those here present the court-martial proceedings should be held first. However, four other judges of the Second Circuit Court of Appeals apparently disagreed with his position in those two cases.

honorable discharge which would in effect disentitle him to the honorable discharge to which this Court has found he was entitled on May 22, 1968. For these reasons, this Court will not withhold action on the pending petition until the court-martial proceedings are concluded. In any event, according to the Manual for Courts-Martial (1951 Ed.) and the opinions of legal officers of the Navy elicited at the hearing, conscientious objection is not a defense to the charges which petitioner is facing in the pending court-martial proceedings.[11]

A more serious question is whether this Court's decision that petitioner is entitled to a discharge would prevent the Navy from punishing him for breaches of discipline that occurred while he was still a member of the armed services. The parties concede that after petitioner's discharge the Navy could not try him for the 3-year offense. However, under 10 U.S.C. § 803(a), a serviceman who has been discharged may still be tried by court-martial for an offense committed while in the service which is punishable by confinement for 5 years or more.[12] What has been said in this opinion is in no way intended to prevent the Navy from invoking this statute in order to try petitioner for violations of military discipline committed while he was in the service.[13] Whether there are legal or other defenses which petitioner can successfully assert to these military charges will have to be determined at the subsequent trial of the court-martial proceedings.

Petitioner's rash and impatient action in flaunting military discipline cannot be condoned. He justifies his taking matters into his own hands as necessary to secure a review of the adverse and erroneous decision on his original application. Had he filed a petition for habeas corpus in July of 1968 or had he shown more patience and awaited processing of his revised application under the new regulations, he would not be in the predicament in which he finds himself today.

■ In any event and even if it were subsequently to be held that petitioner may not be tried for breaches of military discipline after his discharge, this Court holds that a writ of habeas corpus should now issue in this case. Petitioner was entitled as a matter of law to an honorable discharge as a conscientious objector on May 22, 1968. His later ill-considered actions do not disentitle him to such discharge although they may result in his being later subjected to punishment by the Navy.

An appropriate order will be entered granting the petition.

---

11. The Assistant United States Attorney who tried this case for the government conceded that it was the Navy's position that petitioner's status as a conscientious objector was not a defense to the pending charges. However, he suggested that there was no final determination of this question by the federal courts. Under this Court's view of the pending case, it is not necessary to decide this issue.

12. In United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), the Supreme Court held this section unconstitutional as applied to the facts of that case. The Navy takes the position that the *Toth* case is distinguishable on its facts from those here present and asserts its right to continue with the trial of petitioner under Article 90 of the Uniform Code of Military Justice, even if he is discharged as a conscientious objector.

13. The granting of the pending petition will of course affect the severity of the punishment that may be imposed for petitioner's breaches of military discipline, reducing the maximum sentence that may be imposed to five years' imprisonment.