747 F.2d 217
 Leslie A. COLE, uuc-tu-axog HTFR/E-1, USN, Appellee,
v.
Commanding Officer, U.S.S. L.Y. SPEAR (AS-36), Commanding
Officer, Fort George G. Meade, The Secretary of
Defense, and Commander, Naval Military
Personnel Command, Appellants.
 No. 83-1382.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 4, 1984.
Decided Oct. 25, 1984.
 
 R.W. Gehring, Lieutenant Colonel, Baltimore, Md. (J. Frederick Motz, U.S. Atty., and William D. Quarles, Asst. U.S. Atty., on brief), for appellants.
 James Feldman, Jr., and Harold Buchman, Baltimore, Md. (Brian Rudnick, Baltimore, Md., on brief), for appellee.
 Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, and CHAPMAN, Circuit Judges, sitting in banc.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 The Navy appeals from an order of the district court granting Leslie A. Cole, an enlisted active member of the Navy, a discharge as a conscientious objector (C.O.). It was the view of the district court that Cole was eligible for a C.O. discharge and that the Navy effectively had denied it without any basis in fact. The Navy then placed Cole on appellate leave and obtained from us a stay of her discharge pending appeal.
 
 
 2
 We now reverse the order of the district court.
 
 I.
 
 3
 This is a case of a young woman who voluntarily enlisted in the Navy and who, after seventeen months of service, experienced a crystallization of C.O. views. The history of her relations with the Navy are set forth in an affidavit, based upon written records and personal recollection, of the legal officer on board the ship to which Cole was assigned. Because of its length, the body of the affidavit is appended as an appendix to this opinion.
 
 
 4
 The affidavit demonstrates that in July and August, 1982, Cole committed a number of military infractions. Although her request for reassignment of duties was honored, she was punished by confinement and reduction in pay for these infractions. While confined, she was advised how to effect her release from the service as a C.O., and on October 12, 1982, she made application therefor. Her application and the hearing thereon received favorable consideration at the initial administrative level. Cole learned on January 21, 1983, that final action on her application would not be forthcoming for another four to five weeks, and within four days, Cole refused to perform her duties or to wear her uniform, ostensibly because of her beliefs. Cole's refusals brought on disciplinary action ultimately resulting in confinement, forfeiture of pay and a bad conduct discharge. Cole had served almost all of her sentence before she was released by the district court. She has not, however, been discharged from the Navy.
 
 
 5
 The pendency of the proceedings for Cole's second set of infractions also halted final administrative action on her application for discharge because of the provisions of Art. 3620230.5 of the Navy Military Personnel Manual:
 
 
 6
 Commander, Naval Military Personnel Command, shall be informed by message if, after submitting an application for designation or discharge as a conscientious objector, the member commits an offense punishable under the UCMJ or, if at the time of submission of an application, the member is the subject of disciplinary action, and when disciplinary action has been completed. Final action on an application or an approved request for discharge shall not be effected until all disciplinary action, including confinement if applicable, has been resolved.[1]
 
 
 7
 This personnel regulation was adopted under the authority of regulations of the Department of Defense, setting forth procedures governing conscientious objectors and processing requests for discharge based on conscientious objection. 32 C.F.R. Secs. 75.1 et seq. Section 75.6 of those regulations, after setting forth the procedure for applying for separation and consideration of the application, states:
 
 
 8
 (g) Processing of applications need not be abated by the unauthorized absence of the applicant subsequent to the initiation of the application, or by the institution of disciplinary action or administrative separation proceedings against him. However, an applicant whose request for classification as a conscientious objector has been approved will not be discharged until all disciplinary action has been resolved.
 
 
 9
 (h) To the extent practicable under the circumstances, during the period applications are being processed and until a decision is made by the headquarters of the service concerned, every effort will be made to assign applicants to duties within the command to which they are assigned which will conflict as little as possible with their asserted beliefs....
 
 
 10
 Section 75.6(g) and (h). From the discretionary language of Sec. 75.6(g) ("[p]rocessing of applications need not be abated ... by the institution of disciplinary action"), it is manifest that the Navy has discretion to abate processing an application until disciplinary action has been resolved. In any event, the regulation forbids the discharge of any member of the military until all disciplinary action has been resolved.[2]II.
 
 
 11
 Parisi v. Davidson, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972), states all of the law necessary to a decision of this case with respect to the jurisdiction of the federal civilian courts to intervene in the military system of justice. In Parisi, which is distinguishable from the instant case by the fact that Parisi's application for a C.O. discharge as a conscientious objector had been finally denied before he sought habeas corpus in a federal district court, the opening sentence of the opinion states a controlling principle:
 
 
 12
 When a member of the armed forces has applied for a discharge as a conscientious objector and has exhausted all avenues of administrative relief, it is now settled that he may seek habeas corpus relief in a federal district court on the ground that the denial of his application had no basis in fact.
 
 
 13
 405 U.S. at 35, 92 S.Ct. at 816. Later in the opinion, the Court pointed out that Parisi had exhausted all available administrative remedies so that exercise of federal district court jurisdiction was proper. 405 U.S. 37-39, 92 S.Ct. at 817-819.
 
 
 14
 Cole has not exhausted her administrative remedies. Her application for separation as a C.O. has been neither granted nor denied. Under the established doctrine of exhaustion of administrative remedies, the district court should have declined to exercise jurisdiction unless there is a valid reason to excuse her from the necessity of exhaustion. We would concede that the sincerity of Cole's views as a C.O. are established on the present record and that a denial of her discharge on that ground would lack a basis in fact. But we do not think that the ultimate merit of her claim provides any excuse from the necessity of exhaustion.
 
 
 15
 The district court in effect excused exhaustion on the ground that the Navy Personnel regulation operates as the functional denial of Cole's application. That approach presumably stems from the perception that the Navy made exhaustion impossible and the conclusion that Cole therefore should not be held to the exhaustion requirement. We think that this approach is fallacious because it overlooks two crucial factors. First, Cole--rather than the Navy--was primarily responsible for the suspension of administrative processing of her application. She persisted in her refusal to obey orders and to observe military protocol, although she knew her conduct would halt final processing of her application.[3] Second, to the extent that the Navy was responsible for the suspension of final processing, it was acting in accordance with a reasonable regulation applicable to those seeking separation as conscientious objectors.[4]
 
 
 16
 Cole does not attack the validity of the regulation, and the district court did not consider its validity. The regulation embodies the provision of the Department of Defense regulation that disciplinary action takes precedence over the determination that a member of the military is a C.O. in the timing of a discharge. It thus effectively makes remaining on, or returning to, non-disciplinary status one of the conditions for obtaining a conscientious objector discharge.[5] This is not an unreasonable requirement for a branch of the military to adopt.[6] It is manifestly designed to discourage precisely what happened here--the assertion by an enlistee that she can be her own commander-in-chief or her own military judge and decide what orders she will obey and what military protocol she will observe before her claim to conscientious objection is finally established.[7] A military organization simply could not function under such circumstances.
 
 
 17
 In expressing these views, we stress that there is nothing in this record to show that consideration of Cole's claim was unduly delayed[8] or that orders were needlessly given her in conflict with her beliefs so as to lay the groundwork for unnecessary punishment or vindictiveness. We, of course, recognize that under the regulation of the Department of Defense, the Navy had the discretion to process her application at the same time that it carried on disciplinary procedures. But we cannot say that, given the military's need to maintain order and discipline, it is unreasonable or invalid for the Navy to suspend consideration of Cole's application pending resolution of disciplinary actions. Certainly it is reasonable for the Navy to withhold granting a C.O. discharge until all disciplinary action was resolved.[9]
 
 
 18
 We recognize that, unless Cole is successful in overturning her military convictions, she will receive a bad conduct discharge rather than a conscientious objector discharge. This is so because military courts do not generally recognize the defense of conscientious objection for refusal to carry out a lawful order. See Parisi v. Davidson, 405 U.S. at 42-45, 92 S.Ct. at 820-822.[10] Even though we also recognize that it is extremely unlikely that Cole will prevail in the military courts, we think that a bad conduct discharge is the price that she properly may be required to pay. The unquestioned need of the military to preserve order and discipline makes any other conclusion unthinkable.
 
 
 19
 REVERSED.
 
 APPENDIX
 EXTRACT OF AFFIDAVIT
 
 20
 The following is a chronology of the events pertinent to the above styled case, that were extracted from the attached documents and from my personal recollection:
 
 
 21
 June 1982--Petitioner attends a Navy School in San Diego, California;
 
 
 22
 June 28, 1982--Petitioner becomes an unauthorized absentee from school;
 
 
 23
 July 1982--USS L.Y. SPEAR (AS 36) receives correspondence from school advising that Petitioner was an unauthorized absentee and that her military identification card had been found in a trash can;
 
 
 24
 July 28, 1982--Petitioner surrenders at Naval Station, San Diego, California;
 
 
 25
 August 3, 1982--Petitioner returns to USS L.Y. SPEAR (AS 36) under military Technical Arrest Orders;
 
 
 26
 August 3-6, 1982 (approximate)--Petitioner requests to be transferred from Repair Department because she states that working on submarines is objectionable, but she agrees to work as a Food Service Attendant. Petitioner is transferred to Food Service Division;
 
 
 27
 August 13, 1982--Petitioner appears at Nonjudicial Punishment Hearing for unauthorized absence of 28 June to 28 July 1982. At that Hearing, she refuses to salute the Captain or observe military protocol. The Commanding Officer awards punishment of 30 days correctional custody, reduction in rate one pay grade (to E-2) and forfeiture of $300 pay per month for two months;
 
 
 28
 August 13, 1982--Petitioner is taken to Correctional Custody Facility at Fort Eustis, Virginia. She refuses to submit to correctional custody or to obey the orders of noncommissioned officers. Fort Eustis returns Petitioner to the USS L.Y. SPEAR (AS 36);
 
 
 29
 August 17, 1982--Petitioner is tried by Summary Court-Martial for refusing the order of the Commanding Officer, USS L.Y. SPEAR, to submit to correctional custody, disrespect to the Commanding Officer at the Nonjudicial Punishment Hearing; disobeying an order of a Chief Petty Officer to salute the Captain at the Nonjudicial Punishment Hearing and disobeying orders of the noncommissioned officers at Fort Eustis. Petitioner is acquitted of disrespect to the Commanding Officer and one orders violation at Correctional Custody Unit. Petitioner is found guilty of other charges and sentenced to confinement at hard labor for a period of thirty days, reduction in rate to the pay grade of E-1, and forfeiture of $300 pay per month for one month. The Commanding Officer suspends execution of the forfeiture of pay. Petitioner is confined at Newport News City Jail, Newport News, Virginia;
 
 
 30
 August 17--12 September 1982--Chaplain Hummer visits the Petitioner at Newport News City Jail on a weekly basis. On each visit, Chaplain discusses with the Petitioner her conscientious objector beliefs and advises her on the procedures for submitting an application;
 
 
 31
 September 13, 1982--Petitioner is released from confinement and returns to USS L.Y. SPEAR (AS 36);
 
 
 32
 September 22, or 29, 1982--Petitioner has Request Mast with Commanding Officer in the presence of the Command Master Chief, Commanding Officer explains to the Petitioner the procedures for submitting a conscientious objector application and impresses on her the importance of obtaining thorough substantiation. Commanding Officer advises the Petitioner to submit a Special Request to apply for a Conscientious Objector Discharge and to contact the Personnel Office to obtain information on how to apply for a Conscientious Objector Discharge;
 
 
 33
 September 28, 1982--(approximate) Petitioner submits to Chaplain Hummer a statement of approximately 54 pages in support of her request for a Conscientious Objector Discharge;
 
 
 34
 Late September to Early November 1982--Chaplain Hummer works with Petitioner almost daily in assisting her in explaining the evolution of her beliefs and in putting her petition in the proper format, in order to enhance her chances of favorable and expeditious action on her request. Chaplain Hummer advises petitioner to arrange for a psychiatric evaluation through the Medical Department;
 
 
 35
 October 12, 1982--Date of finalized conscientious objector petition;
 
 
 36
 October 27, 1982--Petitioner submits Special Request to apply for a Conscientious Objector Discharge. All persons in the chain of command recommend approval;
 
 
 37
 November 2, 1982--Acting Executive Officer approves special request;
 
 
 38
 Early November 1982--Petitioner advises Chaplain Hummer that the latest draft of the conscientious objector application is the last one that she will prepare;
 
 
 39
 November 5, 1982--Psychiatric evaluation complete;
 
 
 40
 November 8, 1982--Chaplain's report complete;
 
 
 41
 Mid November 1982--Personnel Officer brings Petitioner's conscientious objector file to Legal Officer. Legal Officer contacts Naval Legal Service Office same day to obtain a Hearing Officer and arrange for a hearing. Legal Officer contacts Hearing Officer who states that the first available time for the hearing is the first week in December. Hearing Officer requests that Legal Officer be present at the hearing. Because of Legal Officer's scheduled leave period, hearing is scheduled for December 13th;
 
 
 42
 Mid to late November 1982--Legal Office personnel assist petitioner in arranging witnesses for the hearing.
 
 
 43
 November 30--December 10, 1982--Legal Officer on leave to get married;
 
 
 44
 December 13, 1982--Conscientious Objector Hearing held;
 
 
 45
 December 13--22, 1982 (approximate) Legal Office prepares transcript of hearing; delivered to Hearing Officer;
 
 
 46
 December 30, 1982--Hearing Officer's report recommending approval of Conscientious Objector's discharge received;
 
 
 47
 January 6, 1983--Command endorsement on conscientious objector request complete; recommends that petition be reviewed in accordance with current Navy policies. Conscientious objector package forwarded to Naval Military Personnel Command;
 
 
 48
 January 6--24, 1983--Petitioner periodically inquires of the Leagl [sic] Office as to the status of her conscientious objector request. Naval Military Personnel Command contacted on or about January 14, 1983 to inquire as to status of request;
 
 
 49
 January 21, 1983--In response to the petitioner's request, Legal Office calls Naval Military Personnel Command to inquire as to status of petition and is advised that processing will take another 4 to 5 weeks. Petitioner becomes upset and states that she will wait until the end of the month and then she will leave. (At her later Military Magistrate Hearing Petitioner denies that she stated that she would leave, and asserts that she had said that she would wait until the end of the month and then take other action);
 
 
 50
 January 24, 1983--Petitioner sees movie "Gandhi";
 
 
 51
 January 25, 1983--Petitioner tells her supervisors that she will no longer work or wear a uniform. Petitioner is advised by Legal Officer that she is in an arrest status, and that she is not to leave her berthing compartment.
 
 
 52
 January 26, 1983--Petitioner has a Nonjudicial Punishment Hearing before the Commanding Officer for refusal to work or to wear a uniform and is awarded a Special Court-Martial;
 
 
 53
 January 27, 1983--Legal Officer advises Petitioner that Naval Military Personnel Command will not act on her Conscientious Objector Request while she is in a disciplinary status. Legal Officer attempts to convince Petitioner that it would be in her best interest to return to work and wear the uniform and to await a decision on her conscientious objector request. Petitioner remains firm in her refusal to work or to wear a uniform;
 
 
 54
 January 28, 1983--Petitioner is placed in pretrial confinement at Newport News City Jail. Confinement deemed necessary due to a statement made to Legal Office personnel on January 24, 1983, to the effect that she intended to leave if she did not get an answer by the end of January;
 
 
 55
 February 1, 1983--Military Magistrate Hearing is held to determine if continued pretrial confinement is justified. Military Magistrate holds that continued pretrial confinement is warranted based on her statement of January 24, 1983 concerning her intent to leave; Petitioner taken from the hearing directly to the Naval Legal Service Office accompanied by the Legal Officer to expedite the assignment of a defense counsel. Petitioner sees a defense counsel;
 
 
 56
 February 25, 1983--Petitioner is tried by a Special Court-Martial and found guilty of two specifications of failure to go to her appointed place of duty and 4 specifications of violating orders of a Chief Petty Officer. Petitioner is acquitted of 6 specifications of failure to go to appointed place of duty and 1 specification of violating an order. Petitioner is sentenced to be confined at hard labor for a period of 60 days, to forfeit $375 pay per month for 3 months and to be discharged from the Naval Service with a Bad Conduct Discharge. Petitioner is confined at Installation Detention Facility, Fort George G. Meade, Maryland;
 
 
 57
 March 17, 1983--Proceeding in Revision is held to correct defective advice by the Military Judge concerning her rights to have military counsel of choice at her Special Court-Martial;
 
 
 58
 March 24, 1983--Commanding Officer, USS L.Y. SPEAR (AS 36) approves sentence awarded at the court-martial. Record of trial forwarded to Commander Submarine Force, U.S. Atlantic Fleet, for Supervisory Authority Review.
 
 SPROUSE, Circuit Judge, dissenting:
 
 59
 I respectfully dissent. There is no question that Cole's conscientious objector beliefs were sincere and that if her application had been fully processed she would have received an honorable discharge. She followed all Navy procedures required to process her application, including a formal hearing, and the hearing officer recommended approval of a conscientious objector discharge. In transmitting this recommendation to the Naval Military Personnel Command, Cole's commanding officer made no recommendation himself, but merely noted that her beliefs appeared sincere. Possibly frustrated by the timetable of review by the Personnel Command, Cole refused to wear her uniform and to perform military duties. As the majority opinion correctly narrates, the Navy suspended action on her conscientious objector application. As a result of her subsequent court-martial, the application was never again considered. Cole received a bad conduct discharge.
 
 
 60
 The majority concedes the merits of Cole's application for a conscientious objector discharge, but holds that the district court should have declined to exercise jurisdiction. I agree with the majority that we need look no further than Parisi v. Davidson, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972), for guidance in resolving the principal issue on this appeal. I disagree with the conclusion of my colleagues that Parisi mandates that Cole was required to exhaust military remedies of questionable value to her before resorting to the civilian judicial apparatus.
 
 
 61
 As the majority points out, the rule of law governing this case was carefully stated by Justice Stewart in Parisi: "When a member of the armed forces has applied for a discharge as a conscientious objector and has exhausted all avenues of administrative relief, it is now settled that he may seek habeas corpus relief in a federal district court on the ground that the denial of his application had no basis in fact." 405 U.S. at 35, 92 S.Ct. at 816 (emphasis added). The Navy's jurisdictional argument approved by the majority relies on the underscored language. It contends that Cole has not met the administrative exhaustion requirement of Parisi because her conscientious objector application, unlike Parisi's, was never completed and formally denied before she invoked the district court's habeas jurisdiction. In effect, the majority concludes that Cole's infractions and the interacting Navy regulations amount to a failure to exhaust administrative remedies. In my view, Cole's final situation constitutes not a failure to exhaust but an impossibility to obtain the only administrative review that would have determined whether or not she was entitled to a conscientious objector discharge.
 
 
 62
 Parisi involved an Army draftee who expressed a crystallization of conscientious objector views after nine months of military service. His application for a conscientious objector discharge was denied by the Department of the Army despite recommendations of approval from the base chaplain, base psychiatrist, special hearing officer, and commanders of an Army hospital and Army training center. Parisi appealed the denial to a military review board and sought a writ of habeas corpus in federal district court. The court stayed considering the merits of the habeas petition until completion of administrative review of the discharge denial. While that review was pending, Parisi refused an order to board a plane for Vietnam and was charged with a court-martial offense. The military review board later upheld the discharge denial, but the district court again stayed consideration of the merits of the habeas petition, this time pending resolution of the court-martial. 405 U.S. at 35-37, 92 S.Ct. at 816-818. The Supreme Court held that a pending court-martial should not stay the habeas petition. Parisi exhausted all administrative remedies for obtaining a conscientious objector discharge, id. at 38-39, 92 S.Ct. at 818-819; and principles of comity did not require the district court to stay its hand in deference to an independent proceeding that lacked a "reasonable promptness and certainty" of offering Parisi the relief he sought, id. at 41-42, 92 S.Ct. at 819-820.
 
 I.
 
 63
 Parisi thus firmly establishes the federal court's obligation to entertain habeas petitions despite ongoing disciplinary proceedings in a military tribunal. Principles of comity, the Court in Parisi explained, do not demand that the federal judiciary delay its consideration of a conscientious objector's habeas claim unless the same relief "would also be available to him with reasonable promptness and certainty through the machinery of the military judicial system." 405 U.S. at 41, 92 S.Ct. at 820. The Court, in concluding that such relief was not available to Parisi in the military courts, relied on a crucial distinction between courts-martial and administrative proceedings that determine conscientious objector claims:
 
 
 64
 Courts-martial are not convened to review and rectify administrative denials of conscientious objector claims or to release conscientious objectors from military service. They are convened to adjudicate charges of criminal violations of military law.
 
 
 65
 405 U.S. at 42, 92 S.Ct. at 820.
 
 
 66
 In denying relief to Cole, the majority distinguishes Parisi because there the serviceperson received a final decision on his eligibility, thus plainly exhausting his administrative remedies and meeting the jurisdictional prerequisites for the exercise of the district court's habeas power. On the other hand, the majority concludes that the suspension of Cole's conscientious objector proceeding prior to final decision leaves the process of administrative review unexhausted. I believe that the district court took a more perceptive view of Cole's case in reasoning that the suspension of Cole's conscientious objector proceeding was equivalent to a de facto denial and that the ongoing disciplinary proceedings offered her no reasonably prompt administrative avenue for gaining consideration for her application.
 
 
 67
 By the time Cole applied for federal habeas relief, she had been convicted of various charges of misconduct stemming from her personal aversion to war, sentenced to sixty days of hard labor, ordered to forfeit $375 pay per month for the next three months, and awarded a bad conduct discharge.[1] The only military review open to her at this juncture was in the military appeals courts, and those tribunals could not determine her conscientious objector status. Parisi, 405 U.S. at 42-44, 92 S.Ct. at 820-821. Cole was placed in an impossible posture. She could not restart the administrative machinery responsible for processing her conscientious objector application without proving her innocence through the court-martial proceedings. In turn, she could not prove her innocence and avoid a bad conduct discharge without convincing the military appeals courts to accept her conscientious objections as a defense to the disciplinary charges--a step rejected in the past and ultimately not taken in Cole's case.
 
 
 68
 The possibility, then, that Cole would eventually secure administrative consideration of her conscientious objector claim through the court-martial machinery was highly improbable and certainly inadequate when compared to the remedies available to her had the Navy processed her application to completion without regard to the pending disciplinary proceedings. Viewed realistically, the suspension order impaired her chances for a conscientious objector discharge more than a final adverse decision would have, because in the latter instance there would have been no question concerning her right to federal habeas review. Parisi, 405 U.S. at 45, 92 S.Ct. at 821; Cooper v. Barker, 291 F.Supp. 952, 959 (D.Md.1968).
 
 II.
 
 69
 The Navy argued on appeal that, even if its suspension action was equivalent to a denial of Cole's application, the denial was pursuant to its lawful regulations. It maintained that its regulations form part of the administrative apparatus that Cole must exhaust before she can meet the prerequisites for invoking the federal court's habeas jurisdiction. The Navy's argument, however, rests on infirm foundations.
 
 
 70
 The requirement that a petitioner should exhaust administrative remedies before coming into court is not a doctrine of jurisdictional power, but of comity. McKart v. United States, 395 U.S. 185, 193-95, 89 S.Ct. 1657, 1662-63, 23 L.Ed.2d 194 (1969); United States ex rel. Tobias v. Laird, 413 F.2d 936, 939 (4th Cir.1969). The doctrine is of judicial creation and consequently draws its essence from the various prudential considerations that restrain the judiciary from interfering unduly with the lawful operations of coordinate branches of government. Practical considerations, of course, also come into play in the judiciary's decision to require administrative exhaustion. The courts often benefit from an agency's special expertise in matters with which it deals repeatedly. Moreover, valuable resources are spared by a consistent exhaustion policy because "often the agency's ultimate decision will obviate the need for judicial intervention." Schlesinger v. Councilman, 420 U.S. 738, 756-57, 95 S.Ct. 1300, 1312-13, 43 L.Ed.2d 591 (1975).
 
 
 71
 The exhaustion requirement, however, is not to be blindly invoked. Its "[a]pplication ... to specific cases requires an understanding of its purposes and of the particular administrative scheme involved." McKart, 395 U.S. at 193, 89 S.Ct. at 1662. It is a doctrine "subject to numerous exceptions," id., and courts must be especially alert to that characteristic for it is still their lawful power to entertain an issue that is being prudentially relinquished. As this court has recognized, on appropriate facts habeas relief may be granted to a service-person "even if further administrative avenues appear[ ] theoretically open." Tobias, 413 F.2d at 939.
 
 
 72
 The military concededly is a " 'specialized society ...' with 'laws and traditions ... [developed] during its long history.' " Schlesinger v. Councilman, 420 U.S. at 757, 95 S.Ct. at 1313 (citation omitted). Its vital role in preserving the nation's security and long tradition of autonomous operations support a strong exhaustion requirement in matters committed to its special expertise. Id. At no time, however, has the exhaustion doctrine been held to permit any agency, military or otherwise, to insulate itself from judicial review by administrative regulation. Such a mechanical view of the exhaustion doctrine would soon produce bizarre and constitutionally unacceptable results. Hammond v. Lenfest, 398 F.2d 705, 715 (2d Cir.1968). An administrative agency effectively could preempt the judicial branch from exploring the limits of its own power, by creating a series of artificial barriers for the claimant to overcome in order to perfect his right to federal court review. The principle of comity underlying the exhaustion doctrine creates responsibilities running in both directions. It demands that courts refrain from interfering in the lawful procedures of agencies, but likewise exacts reciprocal obligations from the administrative agencies. See, e.g., Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953); Hammond v. Lenfest, 398 F.2d 710.
 
 
 73
 I do not intimate that there is anything inherently improper about the Navy regulations involved in this appeal. I believe instead that, as applied to the peculiar circumstances of Cole's case, the regulations made futile further resort to the administrative machinery responsible for conscientious objector processing.[2] See K. Davis, Administrative Law Text Sec. 20.07 (3d ed. 1972); United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 429-30, 86 S.Ct. 1539, 1542-43, 16 L.Ed.2d 662 (1966); Tobias, 413 F.2d at 939. The Navy received a fair and effective opportunity to rule on Cole's conscientious objector application, but refused to process the application in deference to its regulations governing pending disciplinary charges. See Smith v. Digmon, 434 U.S. 332, 333-34, 98 S.Ct. 597, 598-99, 54 L.Ed.2d 582 (1978) (per curiam) (claim raised in petitioner's brief but not addressed by state appellate court satisfies exhaustion); Toney v. Franzen, 687 F.2d 1016, 1021-22 (7th Cir.1982) (claim exhausted if state court ignores issue or leaves room for further litigation); Hudson v. Rushen, 686 F.2d 826, 830 (9th Cir.1982), cert. denied, 461 U.S. 916, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983) (sixth amendment claim exhausted when court of appeals decided it adversely and the State Supreme Court denied certiorari, despite fact that certain relevant authorities not considered).
 
 
 74
 The district court's attempt to redress the consequences for Cole of the Navy's refusal to process her conscientious objector application was well within the narrow role that the Supreme Court has assigned federal courts in reviewing the military's conscientious objector decisions. The Court has limited the judicial inquiry to the "no basis in fact" standard of review and has cautioned courts to "give careful consideration to the appropriate demands of comity in effectuating [their] habeas corpus decree[s]." Parisi, 405 U.S. at 35, 46, 92 S.Ct. at 816, 822 (footnote omitted). See also Tobias, 413 F.2d at 939. In cases in which pending disciplinary charges are unconnected to deep-seated conscientious objector beliefs, comity should require that the district court refrain from ordering a conscientious objector discharge until the military court-martial proceedings have run their course. Parisi, 405 U.S. at 46 n. 15, 92 S.Ct. at 822 n. 15. Indeed, there may be circumstances in which the "demands of comity" counsel against the issuance of a habeas decree even though the applicant's ongoing disciplinary proceedings involve charges related to deep-seated personal beliefs. These are determinations that are best resolved by the reviewing court in individual cases.
 
 
 75
 The district court in the present case, however, operated within the narrow limits defined by Parisi. It determined Cole's eligibility for a conscientious objector discharge under the "no basis in fact" standard and, contrary to the Navy's arguments, fashioned a remedy that properly accommodated the military's interest in punishing wrongdoers. At the time the habeas decree issued, Cole had already served much of her prison sentence, sustained the mandated pay reduction, and received notification of her discharge from the Navy. The only real relief she received from the district court was having her bad conduct discharge changed to show dismissal from the service because of her conscientious objections. The intrusion on military punishment prerogatives, therefore, was minimal.
 
 
 76
 A service person claiming conscientious objector beliefs of course does not have special dispensation to flout military disciplinary rules. Miscreant personnel operating under that misconception will soon discover the judiciary to be an inhospitable forum. Cole's misguided actions, however, were hardly born of a desire to embarrass or defy military authorities. Her ordeal concededly was largely of her own making and the Navy cannot be faulted for demanding that she be punished for her misconduct. Had she conformed her conduct to the strictures of military life for sixty more days, her conscientious objector application would have been processed in accordance with Navy regulations and undoubtedly approved, thus avoiding this entire episode. Personal conscience, however, is a difficult force to restrain in the most disciplined of minds and, though that does not excuse Cole's rash behavior, it does explain her failure to adhere to military rules while her conscientious objector application was being processed.
 
 
 77
 Because I would affirm the district court's order, I respectfully dissent.
 
 
 78
 I am authorized to state that Judge JAMES DICKSON PHILLIPS, Judge MURNAGHAN and Judge ERVIN join in this dissent.
 
 
 
 [1]
 Article 3610100 of the Manual, dealing with enlisted administrative separations, similarly states:
 All pending military offenses should be disposed of under the UCMJ [Uniform Code of Military Justice] prior to processing a member under the provisions of these articles except where a member has requested separation in lieu of trial by court-martial....
 
 
 [2]
 In a post-argument affidavit, an officer of the Army, possessing the relevant information, supplied us with comparative data as to the course followed by the several branches of the military with regard to the discretionary language of Sec. 75.6(g). It appears that the Army, like the Navy, suspends the processing of an application for a C.O. discharge until disciplinary action has been resolved; and if the disciplinary action results in a punitive (bad conduct or dishonorable) discharge, processing of the C.O. discharge application will not resume unless and until the punitive discharge has been remitted or disapproved. The Marine Corp and the Air Force retain the option of deciding the application, but if they conclude to grant a C.O. discharge, they will not deliver it while a punitive discharge remains in the sentence
 In response, Cole submitted three affidavits: one from a member of the Air Force, who said that his C.O. application was processed while his court martial was pending and that he was ultimately given a C.O. discharge; another from a member of the Army, who said that his C.O. application was processed while he was awaiting his court martial; and a third from a member of the Navy, who said that his C.O. application was processed while he was serving his sentence imposed by Captain's Mast and that he was ultimately given a C.O. discharge. While these affidavits may question the uniformity of practice within the Army and the Navy, it is significant that none of the affiants claims that he was given a C.O. discharge after having been given a punitive discharge.
 
 
 [3]
 The affidavit annexed hereto shows that on January 27, 1983, an effort was made to convince Cole to return to work and to wear her uniform so as not to halt processing of her application. She, nonetheless, persisted in her refusals
 
 
 [4]
 Of course in the instant case, the Navy applied its own regulation to suspend further consideration of Cole's C.O. application. Arguably, the regulation would authorize only postponing delivery of a C.O. discharge while pending disciplinary action was unresolved. We need not concern ourselves with the correctness of the Navy's interpretation of its regulation because we deem each course of action the functional equivalent of the other. Our concern is whether the Navy's failure to grant the C.O. discharge was reasonable under the circumstances of this case
 
 
 [5]
 Accordingly, even if the suspension of processing should qualify as a denial of Cole's application for jurisdictional purposes, the Navy's "denial" was appropriate since Cole had failed to fulfill all the requirements for obtaining a conscientious objector discharge
 
 
 [6]
 Because, as the Supreme Court recognized in Parisi, an enlisted person's right to a conscientious objector discharge is a function of the military's administrative grace, Parisi, 405 U.S. at 38, n. 2, 92 S.Ct. at 818, n. 2, the military certainly may circumscribe that right with reasonable regulations. So long as the restrictions placed on the right are reasonable, the judiciary has no warrant to interfere
 
 
 [7]
 It should be noted that the regulation of the Department of Defense, 32 C.F.R. Sec. 75.6(h), set forth in the text, requires that "[t]o the extent practicable under the circumstances" applicants for separation as conscientious objectors shall be assigned "to duties within the command ... which will conflict as little as possible with their asserted beliefs..." In this case, Cole was transferred, at her request, from repair work on submarines to duties as a food service attendant even before she filed a formal application for separation
 
 
 [8]
 It is perhaps significant that almost four months elapsed between Cole's first overt manifestation of her beliefs--her unauthorized absence of June 28, 1982--and the date of her formal application for separation (October 12, 1982). The hearing on Cole's application was held December 13, 1982, resulting in a recommendation on December 30, 1982, that her application be granted. Despite her marked delay in beginning the proceedings, she announced on January 21, 1983, that she would decline to conform to military protocol and military orders after January 31, 1983. In fact she ceased to conform on January 25, 1983
 
 
 [9]
 See n. 2, supra. It is significant that even those branches of the military which will process a C.O. application while disciplinary action is pending, will not deliver it if a punitive discharge results from the disciplinary action so long as the punitive discharge is extant
 
 
 [10]
 Of course in Parisi, it was conceded that if Parisi was entitled to conscientious objector status, the court martial charges against him were invalid. 405 U.S. at 46 n. 15, 92 S.Ct. at 822 n. 15. But Parisi's refusal to obey the order to report for deployment to Vietnam occurred after his application for discharge was unlawfully finally denied. Here Cole committed military offenses while her application for discharge was pending. In any event, the Court has said that "the question whether wrongful denial of conscientious objector status may be raised as a defense against various types of military charges must remain with the military courts..." 405 U.S. at 44 n. 13, 92 S.Ct. at 821 n. 13. Since the decision in Parisi, the military court of appeals has held that wrongful denial is not an available defense. See United States v. Lenox, 21 U.S.C. M.A. 314, 45 C.M.R. 88 (1972)
 
 
 [1]
 The Court of Military Review affirmed Cole's convictions on December 23, 1983, while this appeal was pending. The Court of Military Appeals denied review on September 5, 1984
 
 
 [2]
 This is not a case in which Cole flouted administrative procedures in favor of federal court remedies. See, e.g., McGee v. United States, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971). She, in fact, pursued the available administrative remedies diligently until the Navy suspended its processing of her application. At that point, it became clear that the suspension, in combination with her disciplinary proceedings, would prevent the administrative process from resuming