UNITED STATES, Appellant

v.

William C. WALKER, Specialist
U.S. Army, Appellee.

No. 93–5018.
CMR 9101209.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 12, 1994.

Decided April 6, 1995.

For the United States: *Major Lyle D. Jentzer* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel James L. Pohl, Major Kenneth T. Grant, Captain Louis E. Peraertz* (on brief); *Colonel John M. Smith* and *Lieutenant Colonel Thomas E. Booth.*

For the Accused: *Major Michael A. Egan* (argued); *Colonel Stephen D. Smith* and *Lieutenant Colonel James H. Weise* (on brief); *Captain Robert Lane Carey.*

*Opinion*

SULLIVAN, Chief Judge:

1. On April 30 and May 1, 1991, the accused was tried by a general court-martial composed of a military judge sitting alone at the Lucius D. Clay Kaserne in Garlstedt, Germany. Contrary to his pleas, he was found guilty of missing movement by design and willful disobedience of a lawful order, in violation of Articles 87 and 90, Uniform Code

of Military Justice, 10 USC §§ 887 and 890, respectively. He was sentenced to a bad-conduct discharge, confinement for 27 months, total forfeitures, and reduction to Private E–1. On September 12, 1991, the convening authority approved the adjudged sentence except for confinement exceeding 16 months. On October 6, 1992, the Court of Military Review[1] set aside the action of the convening authority and ordered a new staff judge advocate recommendation and action. On January 6, 1993, the new convening authority approved the same sentence which had been approved earlier. On June 29, 1993, the Court of Military Review set aside the findings of guilty and the approved sentence, and then dismissed the charges. 37 MJ 892.

2. The Acting Judge Advocate General of the Army on July 22, 1993, certified the following questions of law for review by this Court pursuant to Article 67(a)(2), UCMJ, 10 USC § 867(a)(2) (1989):

### I

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW WHEN IT RULED THAT DSPM [Desert Shield Personnel Message] 31 WAS AN UNLAWFUL CHANGE TO A REGULATION, EVEN THOUGH AR 25–30 INDICATES THAT THE PROPONENT OF AR 600–43 CORRECTLY PUBLISHED THE MESSAGE.

### II

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW WHEN IT APPLIED ITS RULING THAT DSPM 31 WAS UN-

LAWFUL TO APPELLANT, WHEN, AT THE TIME OF APPELLANT'S OFFENSES, THE 2 JANUARY 1991 MESSAGE CHANGED AR 600–43 AND REQUIRED APPELLANT TO DEPLOY TO SAUDI ARABIA IF OPERATIONAL NEEDS REQUIRED IT.

### III

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW WHEN IT SET ASIDE THE FINDINGS IN VIEW OF THIS HONORABLE COURT'S ESTABLISHED PRECEDENT THAT VIOLATION OF A CONSCIENTIOUS OBJECTOR REGULATION DOES NOT CONFER A DEFENSE TO A MEMBER OF THE ARMED FORCES AND THAT CONSCIENTIOUS OBJECTION IS NOT A CONSTITUTIONAL OR FUNDAMENTAL RIGHT. *SEE UNITED STATES V. LENOX,* 21 USCMA 314, 45 CMR 88 (1972). ALSO *SEE GENERALLY UNITED STATES V. COOPER,* 35 MJ 417 (CMA 1992).

We hold that the Court of Military Review erred in ruling that the accused's deployment orders violated Army Regulation (AR) 614–30 (1 Apr 1988) and the January 2, 1991, DSPM message purportedly modifying paragraph 2–10c, AR 600–43.[2] *See generally United States v. Johnston,* 24 MJ 271, 273 ¶ 7 (CMA 1987) ("Terms in a regulation must be interpreted in light of the regulatory context in which they are found and in view of the purpose of the regulation as a whole.").

3. The facts pertinent to resolving the certified issues were found by the Court of Military Review as follows:

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. At trial appellant moved to dismiss the charges or abate the proceedings against him because the disobeyed orders to deploy violated AR 600–43 (1 Aug 83). First, he argued that failure of the command to continue to process his November 13, 1990, application in accordance with AR 600–43 invalidated his subsequent deployment

orders. Second, he argued that his deployment to Saudi Arabia violated the "minimum-conflict"-of-duties provision of this same regulation. *Contra Pruner v. Department of the Army,* 755 F.Supp. 362 (D.Kan.1991). The military judge denied these motions. We note that the Court of Military Review did not address these particular legal claims in its decision and we do not decide them today.

The appellant's offenses occurred following the alert of his unit for deployment to Operation Desert Shield. On 8 November 1990, after his unit was notified of its deployment to Saudi Arabia, the appellant applied for conscientious objector status. He maintained that his Islamic beliefs forbad him from engaging in offensive action against fellow Muslims. Following an interview with his company commander, the appellant was reassigned to the Military Affiliated Radio Systems (MARS) station. His reassignment was ordered so that the appellant would have duties which did not conflict with his religious beliefs and because elements of the MARS station would remain in the United States after the majority of units departed to Operation Desert Shield. In compliance with the conscientious objection regulation, the appellant discussed his request with the division chaplain on 16 November. On 14 December, a mental status evaluation was conducted.

In late November or early December 1990, the appellant's unit commander, while attending a 2d Armored Division staff meeting, became aware of DSPM 31, dated 19 October 1990. The gist of the message provided that soldiers assigned to units alerted for deployment to Operation Desert Shield would deploy, and once in their new location, would then be eligible to apply for conscientious objector status. Following this briefing, processing of appellant's application ceased. Appellant's unit commander testified that sometime between 5 and 12 December, he notified the appellant that he could submit an application for conscientious objector status upon his arrival in Saudi Arabia.

On 2 January 1991, the Department of the Army revised DSPM 31.[3] The modification permitted soldiers assigned to units deploying to Operation Desert Shield to submit a conscientious objector application as operational and mission requirements permitted. The decision whether a conscientious objector applicant would deploy was reserved to the commanding officer exercising general court-martial authority. Under the revised message, applicants could now apply for conscientious objector status at their present duty location instead of waiting until arrival at their new location. It further provided that soldiers were not precluded from deployment and, unless an application has been approved by the appropriate authority, the soldier would prepare for deployment.

In the instant case, appellant's chain of command was not aware of the 2 January modification of DSPM 31, nor was he advised of its content. Additionally, his record is void of any matter indicating whether the appellant's application was presented to the commanding officer exercising general court-martial authority or whether that officer weighed operational and mission requirements with appellant's request for conscientious objector status.

On 6 January 1991, the Deputy Staff Judge Advocate of the 2d Armored Division, spoke to appellant encouraging him to deploy with his unit to Saudi Arabia. Appellant declined to participate based on his conscientious objection and missed the movement of his unit to Operation Desert Shield. Later, the deputy and staff judge advocate met with the appellant's company commander to discuss appellant's refusal to deploy with his unit. On 8 January 1991, the appellant was ordered "to process through the deployment site and board the bus to Hamburg." The appellant again declined to obey the order.

37 MJ at 893–94 (footnote omitted).

I

## INTRODUCTION

## LAW OF CONSCIENTIOUS OBJECTION

■ 4. As a starting point, we note that it is well established that a soldier has no constitutional right to be discharged from the service or to disobey military orders because

---

**3.** The January 2, 1991, message in fact purportedly "rescinded" DSPM 31 (19 Oct 90), "effective immediately."

he is a conscientious objector. Moreover, there is no express statutory right to a discharge or to disobey orders based on such a belief. *See Parisi v. Davidson*, 405 U.S. 34, 38 n. 2, 92 S.Ct. 815, 818 n. 2, 31 L.Ed.2d 17 (1972). A soldier, however, may request a discharge on this basis, and in accordance with military regulations, it may be granted as a matter of administrative grace. *See Cole v. Spear*, 747 F.2d 217, 221 n. 6 (4th Cir.1984). *See generally* Department of Defense Directive No. 1300.6—Conscientious Objectors (August 20, 1971), 32 CFR Part 75.

5. In this regard, Section I of the above-noted DoD Directive generally states that it "update[s] uniform Department of Defense procedures governing conscientious objectors and processing requests for discharge based on conscientious objection." Moreover, the above regulation further states in Section IV:

Policy.

A. Administrative discharge prior to the completion of an obligated term of service is discretionary with the Military Service concerned, based on a judgment of the facts and circumstances in the case. However, insofar as may be consistent with the effectiveness and efficiency of the Military Services, a request for classification as a conscientious objector and relief from or restriction of military duties in consequence thereof will be approved to the extent practicable and equitable....

6. In addition, we note that this regulation clearly creates no right in the soldier to disobey military orders while his application for discharge is pending. Section VI specifically states:

H. To the extent practicable under the circumstances, during the period applications are being processed and until a decision is made by the Headquarters of the Service concerned, every effort will be made to assign applicants to duties within the command to which they are assigned which will conflict as little as possible with their asserted beliefs. However, members desiring to file application who are on orders for reassignment may be required by the military service concerned to submit applications at their next permanent duty station. *During the period applications are being processed, applicants will be expected to conform to the normal requirements of military service and to perform satisfactorily such duties to which they are assigned. Applicants may be disciplined for violations of the Uniform Code of Military Justice while awaiting action on their applications.*

(Emphasis added.)

7. Finally, under this regulation, the soldier has no right to disobey orders during an appeal of an adverse decision on his request for discharge. Section VII C states:

C. Persons who are assigned to non-combatant duties, and *persons who are assigned to normal military duties by reason of disapproval of their applications, will be expected to conform to the normal requirements of military service and to perform satisfactorily such duties to which they are assigned.* Violations of the Uniform Code of Military Justice by these members will be treated as in any other situation.

(Emphasis added.)

8. The Department of the Army has also issued specific regulations concerning the processing of conscientious objector applications. *See* AR 600–43—Personnel–General: *Conscientious Objection* (1 Aug 83). Moreover, it has issued other regulations which may apply in certain circumstances to soldiers who have submitted such applications. *E.g.,* Rule 29, Table 2–1; Rule 8, Table 3–1, AR 614–30—*Assignments, Details, and Transfers, Oversea Service* (1 April 1988); para. 3–7*g* (2)(h), AR 600–83—Personnel–General: *The New Manning System–CO-HORT Unit Replacement System* (26 Nov 1986).

---

II.

## DECISION OF THE COURT OF MILITARY REVIEW

9. The certified issues attack the legal correctness of the Court of Military Review's decision in this case. That court reversed the convictions for missing movement and

disobedience of orders. It initially said in pertinent part:

> Rather than restate what two panels of this court have said in *Johnson* and *Wiley* [*see* ¶ 12, *infra* ] we similarly hold that the order given the appellant to prepare for deployment and board the bus to Hamburg, under the unique facts of this case, was illegal.

Under the facts of this case, we are satisfied that the appellant attempted to submit a formal conscientious objector application. Since DSPM 31 had no legal effect, [as the court had earlier held, 37 MJ at 894 ¶ 9] the parent Army Regulation 600–43 controls. *See generally Wiley,* 37 MJ 885 (ACMR 1993). Accordingly, the appellant could submit an application for conscientious objector status any time up until deployed. *When the appellant missed the movement of his unit on 6 January and disobeyed the order to deploy on 8 January 1991, he was in that protected class that the Secretary of the Army had designated as not eligible for deployment. See* Army Reg. 614–30, Assignments, Details, and Transfers: Oversea Service, Table 2–1, Rule 29 (1 Apr 88). *Because he was not eligible for deployment to Operation Desert Shield, the appellant's missed movement and disobedience of the order to deploy were not violations of the UCMJ.*

37 MJ at 894 (emphasis added). We disagree with this legal conclusion: Art. 67(c).[4]

### III

### LEGAL BASIS OF COURT OF REVIEW DECISION

■ 10. Our initial problem with the Court of Military Review's decision is that it did not articulate its legal basis for conclud-

ing that Rule 29 of Table 2–1, AR 614–30, applied to the accused's unit deployment orders. That regulation is entitled, *"Assignment, Details and Transfers, Oversea Service,"* and Rule 29 of Table 2–1 states, "If soldier claims conscientious objection (*See* AR 600–43), then the soldier is ineligible [for overseas service] unless the soldier is rejected by a decision made by HQDA." Moreover, paragraph 2–5 of Section III of that regulation states:

**Section III**

**Overseas Assignment Restrictions**

**2–5.** *Soldiers who may not be moved overseas*

Soldiers may be temporarily or permanently ineligible for overseas movement for the reasons shown in tables 2–1 and 3–1.

(Emphasis added.)

11. Nevertheless, paragraph 2–5 of AR 614–30 applies to the overseas movement of an individual soldier through assignment or reassignment orders. *See* para. 1–5*b* (selecting a soldier for service overseas); para. 2–1*a* (eligibility of a soldier). Paragraph 2–1*h* of the same regulation recognizes this distinction in movement method. It states:

> *h.* Eligibility for soldiers assigned to companies or battalions (or their equivalent) of the COHORT [Cohesion, Operational Readiness Training] unit manning system is predicated on unit life cycles and deployment schedules. OCONUS [outside Continental U.S.] assignment patterns for these soldiers may differ from soldiers selected for overseas assignment by individual assignment methods.

As noted above, the accused's unit—Headquarters and Headquarters Company, 2d Armored Division (Forward)—was already overseas (stationed in Germany) when it was

---

4. As suggested in footnote 2, this is not precisely the same regulatory question decided at trial where the parties were concerned only with a violation of AR 600–43. Appellate Exhibit X is an excerpt from Chapter 4, Table 3–1, AR 614–30 (1 Apr 88) of which the military judge was asked to take judicial notice. However, we note that the accused did not particularly argue that his deployment orders were illegal because he was ineligible for deployment overseas under Table 2–1 or 3–1 of AR 614–30.

The Court of Military Review's decision held that the restriction on filing an application for conscientious objection found in paragraph 2–10*c* of AR 600–43 was not applicable to the accused's unit deployment. Accordingly, it further held that he could file an application for conscientious objection and any subsequent unit deployment orders would be invalid based on his ineligibility status under AR 614–30.

ordered to deploy to South West Asia as part of Operation Desert Shield/Storm. Accordingly, we conclude that the Court of Military Review legally erred in holding that Rule 29, Table 2–1, AR 614–30 rendered his movement orders illegal.

## IV

### RELATED LEGAL BASIS FOR COURT OF MILITARY REVIEW DECISION

12. In any event, paragraph 3–2 of AR 614–30 does provide:

**3–2. Contingency operations**

For contingency operations that do not require mobilization or in the event of the two hundred thousand call up, *the assignment restrictions in Table 3–1 apply.* HQDA will modify or rescind those restrictions as appropriate, depending on the circumstances.

(Emphasis added.) Other panels of the Army Court of Military Review have relied on Rule 8, Table 3–1, AR 614–30 to deal with unit deployment cases arising from Operation Desert Shield/Storm. *See United States v. Johnson,* 37 MJ 982, 985 ¶ 15 (ACMR 1993); *United States v. Wiley,* 37 MJ 885, 887 ¶ 7 (ACMR 1993). Table 3–1 is entitled, "Eligibility for Oversea Service–Contingency Operations and M–Day." Similar to Rule 29 of Table 2–1, relied on by the Court of Military Review, Rule 8 of Table 3–1 provides, "If a soldier has submitted a formal claim for conscientious objector status under AR 600–43 …, then the soldier is ineligible until HQDA takes final action." We agree that the accused's movement as part of Operation Desert Shield/Storm was a contingency operation. *See United States v. Wiley,* 37 MJ at 887 n. 4.

13. The critical question we must decide is whether the accused's unit deployment to Operation Desert Shield/Storm was a contingency operation within the meaning of paragraph 3–2, AR 614–30. Initially, we note that on both January 6 and 8, 1991, he was a member of Headquarters and Headquarters Company, 2d Armored Division (Forward). Moreover, his unit was located at Garlstedt, Germany, and in the process of deploying to

Saudi Arabia as part of Operation Desert Shield/Storm.

14. Paragraph 4–1 of AR 614–30, however, provides:

**Chapter 4**

**Unit Deployments**

4–1. General

*Unit deployments, for purpose of this regulation, are movements of units from CONUS to an overseas location as directed in an Office of Deputy Chief of Staff for Operations (ODCSOPS) unit movement directive.* Unless otherwise indicated, these are PCS moves. Deployment of units under the Unit Manning System are covered in AR 600–83.

On the basis of this paragraph of AR 614–30, we can reasonably conclude that the ineligibility standard of Rule 8 did not apply to the accused's particular unit deployment. As noted above, his unit was deployed from Germany (OCONUS) to the Persian Gulf (OCONUS). This conclusion of inapplicability is buttressed by review of other sections of AR 614–30, which do not note this ineligibility in different situations involving the movement of soldiers who are already overseas. *E.g.,* Chapter 7, Section II: *Consecutive Overseas Tours;* Chapter 8: *Curtailment of Overseas Tours,* AR 614–30.

## V

### ALTERNATIVE HOLDING OF THE COURT OF MILITARY REVIEW

15. The Court of Military Review alternatively held that the accused's deployment orders were illegal because they were issued in violation of the Army Message of January 2, 1991. *See generally Dodson v U.S. Government, Department of the Army,* 988 F.2d 1199, 1204 ¶ 18 (Fed.Cir.1993). The court below said:

Additionally, when the appellant missed the movement of his unit and disobeyed the order to deploy, the 2 January 1991 modification of DSPM 31 [5] was applicable. *There is, however, no showing that the procedures outlined in that change were ever followed in appellant's case.* While

**5.** *See* n. 3, *supra.*

we acknowledge that during this period of time events were moving very quickly, that does not excuse a failure to follow procedural mandates.

37 MJ at 894. We disagree. *See also United States v. Lenox*, 21 USCMA 314, 319, 45 CMR 88, 93 ¶ 23 (1972) (where conscientious objector regulation creates no right to refuse military duties, its violation creates no defense to missing movement or disobedience of orders).

6. The message of January 2, 1991, purportedly changed paragraph 2–10c, AR 600–43, to read as follows:

(1) *A soldier assigned or attached to a unit deploying to a new duty location* new duty location [sic] is the final designation of the deploying unit [sic] *may submit an application for conscientious objector status.* The soldier's submission of a conscientious objector application will not preclude the soldier from deploying with his or her unit. The unit will process the application as operational and mission requirements permit. The soldier will prepare for deployment and deploy with the unit unless the application for conscientious objector status has been approved by the approving authority designated in paragraph 2–8A. In cases where a soldier's application has been forwarded to the Department of the Army Conscientious Objector Review Board (DACORB), the commander exercising general court-martial convening authority over the soldier may, in his discretion, excuse the soldier from deployment, pending decision of the DACORB.

(2) A soldier who receives individual orders for reassignment prior to the submission of conscientious objector application, or a soldier who has departed his or her unit of assignment in compliance with individual reassignment orders, may not apply for conscientious objector status until he or she arrives at the new permanent duty station. The foregoing does not apply to soldier's [sic] who are TDY en route on assignment orders for a period in excess of 8 weeks. These soldiers may apply at their TDY station.

(Emphasis added).

7. Paragraph 2–10c, AR 600–43: *Conscientious Objection* (1 Aug 83) states:

c. *A person who receives orders for reassignment but has not submitted an application,* or a person who has departed his or her unit of assignment in compliance with reassignment orders, *may not apply for conscientious objector status until he or she arrives at the new permanent duty station.* The foregoing does not apply to persons who are TDY en route on assignment orders for a period in excess of 8 weeks. These persons apply at their TDY station.

16. Turning first to the content of the January 2, 1991, Army Message,[6] we note that it does create an expanded right to submit a conscientious-objector application for a soldier alerted for unit deployment beyond that provided in paragraph 2–10c, AR 600–43 (1 Aug. 83)[7] and DSPM 31 (Oct. 14, 1990).[8] The accused in this case, however, had previously submitted his application to appropriate command authorities around November 13, 1990, and its processing was discontinued some 30 days later. The January

(Emphasis added.) Assuming this paragraph even applies to a soldier deploying with his unit, he has no right to apply for conscientious objector status after he "receives" his orders for unit deployment until he arrives at his new duty station.

8. Desert Shield Personnel Message Number 31 (19 Oct. 1990) provided:

UNCLAS ALARACT 089/90
SUBJECT: DESERT SHIELD PERSONNEL MESSAGE NUMBER 31—PERSONNEL APPLYING FOR CONSCIENTIOUS OBJECTOR STATUS
A. AR 600–43, CHAPTER 2.
B. AR 614–30, CHAPTER 4, TABLE 3–1.
1. FOR THE PURPOSES OF AR 600–43, PARAGRAPH 2–10C, THE TERM "REASSIGNMENT" INCLUDES THE DEPLOYMENT OF PERSONNEL AWAY FROM THEIR PRESENT DUTY LOCATION.
2. NOTICE OF "REASSIGNMENT," TO INCLUDE AN ALERT FOR DEPLOYMENT, TEMPORARILY PRECLUDES SOLDIERS FROM SUBMITTING APPLICATIONS FOR CONSCIENTIOUS OBJECTOR STATUS UNTIL AFTER THEY HAVE ARRIVED AT THEIR NEW DUTY LOCATION.
3. AR 614–30, TABLE 3–1, RULE 8 APPLIES ONLY TO THOSE SOLDIERS WHO HAVE SUBMITTED A FORMAL APPLICATION FOR CONSCIENTIOUS OBJECTOR STATUS PURSUANT TO AR 600–43, PRIOR TO RECEIVING NOTICE OF "REASSIGNMENT." A FORMAL APPLICATION CONSIST OF DA FORM 4187 AND ALL OF THE PERSONAL INFORMATION REQUIRED BY APPENDIX B, AR 600–43.
4. SOLDIERS SUBMITTING APPLICATIONS FROM UNITS THAT ARE DEPLOYED OVERSEAS WILL BE RETAINED IN THEIR UNIT AND ASSIGNED DUTIES PROVIDING MINIMUM PRACTICABLE CONFLICT WITH THEIR ASSERTED BELIEFS PENDING FINAL DECISION OF THEIR APPLICATION.
This message applies to a soldier deploying with his unit, but it provides a soldier no right to apply for conscientious objector status after he is notified of impending deployment until he has arrived at the new duty station.

2 message simply does not further require that previously submitted and denied or discontinued applications be revived or that soldiers in general be notified of this expanded right. (Message calls for attention of Personnel Processing Conscientious Objector Applications).

17. In any event, this message also provides that such an application will be processed by his unit "as operational and mission requirements permit." We recognize that the processing of his earlier application was discontinued by his unit in late November or early December by reason of a briefing on an earlier Army Message of October 19, 1990. However, it is pure speculation that resubmission of this same application on or after January 2, 1991, could or would be completed by the time of his movement orders on January 6, 1991. *See* para. 2–1*b*, AR 600–43 (90–day processing time). A putative violation of this message is not sufficient to invalidate military movement orders. *See United States v. Lenox*, 21 USCMA 314, 45 CMR 88 (1972).

18. Finally, and most importantly, the message provides that "[t]he soldier will prepare for deployment and deploy with the unit unless the application for conscientious objector status has been approved by the approving authority designated in paragraph 2–8a." [9] Such a processing condition was permissible to the extent that the revised message expanded his right to file a conscientious objector application beyond that provided in AR 600–43. *See generally Cole v. Spear, supra* (¶ 4). Clearly, the accused's

application was not approved on the dates of January 6 and 8, 1991, and, therefore, he was required to deploy by this message. Moreover, prior to January 6 and 8, 1991, he did not request the General Court–Martial Convening Authority over him to forward his earlier discontinued application to the Department of the Army Conscientious Objector Review Board (paragraph 2–8d) and to excuse him from deployment. Accordingly, no right created by the Army Message of January 2 was violated by the orders to deploy in this case.

## VI

### CONCLUSION

19. We conclude that the Court of Military Review erred in holding that the accused's deployment orders on January 6 and 8, 1991, violated AR 614–30 (1 Apr 88) and the Army Message of January 2, 1991. Moreover, even assuming that the accused was erroneously denied his expanded right to file a conscientious objector application as provided in the Army Message of January 2, 1991, that same message expressly required him to deploy with his unit unless his application had been approved by appropriate authorities. In sum, the service regulation and message relied on by the Court of Military Review did not, as a matter of administrative grace, preclude the accused's deployment with his unit on January 6 and 8, 1991, to Saudi Arabia as part of Operation Desert Shield/Storm. *United States v. Lenox, supra. See also Jones v. Mundy*, 792 F.Supp. 1009, 1012 (E.D. N.C.1992). Thus, the third

---

9. Paragraph 2–10 of AR 600–43 (1 Aug 83) conceivably created an additional right for a soldier to a delay in his reassignment orders once he has properly filed his application for conscientious objector status with his unit. This right to a delay in reassignment orders is found in section *a* of that regulation which states:

    **2–10. Use, assignment, and training.**
    *a.* Except as provided in *b* below, persons who have submitted applications (*see* para 2–1) will be retained in their unit and assigned duties providing minimum practicable conflict with their asserted beliefs, pending a final decision on their applications. *Reassignment orders received after the submission of an application will be delayed until the approval authority makes a final determination.* In the case of

trainees, they will not be required to train in the study, use, or handling of arms or weapons. The trainee is not precluded from taking part in those aspects of training that do not involve the bearing or use of arms, weapons, or munitions. Except for this restriction, conscientious objector applicants are subject to all military orders and discipline, and regulations to include those on training.
(Emphasis added.) *See also* paragraph 2–10*d* (1), which states: "When a request for conscientious objector status has been denied, the person-
(1) Will comply with reassignment orders."
    The Army Message of January 2, 1991, amending AR 600–43, clearly did not extend this right to delay soldiers alerted for unit deployment.

certified issue is answered in the affirmative.[10]

The 1993 decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for submission to the Court of Criminal Appeals for further review under Article 66, UCMJ, 10 USC § 866.

Judge WISS concurs.

COX, Judge, with whom CRAWFORD and GIERKE, Judges, join (concurring in part and in the result):

19.  I agree with much of the lead opinion, but perhaps from a different perspective.

### Army Regulation 614–30 (1 Apr 88)

20.  Insofar as I can determine, Army Regulation (AR) 614–30 ("Oversea Service") has nothing whatever to do with this accused. That regulation deals primarily with the question whether an individual soldier meets the criteria for selection for overseas service *in the first place.* Para. 1–1. The regulation addresses the basic question of whether a given soldier has the qualifications, training, and personal circumstances such that the United States of America is prepared to loose him or her on foreign soil. The accused, of course, was already overseas. Obviously, he had met those criteria sometime earlier. The regulation does not pertain to the matter of overseas redeployment of individuals or units already abroad.

21.  Had AR 614–30 anything to do with the accused's situation, one would have expected it to appear in Chapter 8, which deals with "Curtailment of Overseas Tours." Reasons listed for curtailment run the gamut from security and safety risks, to unusual pregnancy circumstances, to emergency and compassionate reassignments. *See* Table 1–1. There is no mention, however, of a conscientious-objection curtailment or of any rights triggered by the filing of such an application by an overseas soldier.

22.  Even the chapter in the regulation dealing with unit deployments clearly reiterates the following:

> Unit deployments, for purpose of this regulation, are movements of units from CONUS [continental United States] to an overseas location as directed in an Office of Deputy Chief of Staff for Operations (ODCSOPS) unit movement directive.

Para. 4–1.

23.  The Court of Military Review erred, therefore, in holding that the various tables attached to AR 614–30—tables that might preclude sending CONUS soldiers overseas—provided this accused a right to refuse to obey the order to deploy with his unit.

### Army Regulation 600–43 (1 Aug 83)

24.  AR 600–43 ("Conscientious Objection") is the regulation pertaining to this accused's circumstances. One sentence only of the regulation (here quoted in pertinent part) in effect at the time of his refusal to deploy applies particularly to this situation:

> [P]ersons who have submitted applications ... will be retained in their unit and assigned duties providing minimum practicable conflict with their asserted beliefs, pending a final decision on their applications ....

Para. 2–10a ("Use, assignment, and training"), AR 600–43.

25.  The Court of Military Review's conclusion, following *United States v. Wiley,* 37 MJ 885 (ACMR 1993), and *United States v. Johnson,* 37 MJ 982 (ACMR 1993), that this sentence conferred a *right* on this accused to remain in Germany with the unit's rear detachment and a *right* to refuse to obey the order to deploy is irrational. This accused's *rights* were to remain with his unit—wherever it was—and, to the extent "practicable," to be assigned duties involving minimal conflict with his asserted beliefs. Whether the accused was assigned such duties in Germany, Saudi Arabia, Kuwait, Iraq, or elsewhere was a unit call, not his. Since he refused to deploy as ordered, he cannot possibly argue that his command violated his right to mini-

---

10.  Our resolution of this case makes it unnecessary to answer the first two certified issues.

mum practicable conflict with his asserted beliefs. Needless to say, in a theater of operation such as southwest Asia, the opportunities for service not involving compromise of the accused's asserted religious beliefs may have been substantial.

26. Other portions of AR 600–43 (pertaining to persons who have "receive[d] orders for reassignment") plainly do not, on their face, apply to him. This accused was not being reassigned; he had merely been ordered to deploy with his unit.

### Desert Shield Personnel Message (DSPM Number 31)

27. The Court of Military Review concluded that DSPM 31, dated 19 October 1990, was invalid, as it involved a sub-Secretarial modification of AR 600–43. The accused agrees. Clearly, DSPM 31 provided him no relief, however, as it sought to preclude soldiers (such as the accused) who had received notice that their unit was to deploy from filing conscientious objector applications until after arriving at their new duty stations. As no relief from the message is conceivable, it is unnecessary for us, for the purpose of resolving these certified issues, to revisit the Court of Military Review's determination that the message was invalid.

### January Change to AR 600–43

28. The change to paragraph 2–10c, AR 600–43, dated 2 January 1991 (a few days before the accused refused to deploy), also provides him no possible relief. This Secretarial (i.e., lawful) change specifies that applications for conscientious objector status under AR 600–43 could be filed prior to deployment, but that the command might determine that an applicant would not deploy. Clearly, no right to refuse to deploy was granted. As no relief from this revised message is conceivable, it is unnecessary even to

determine whether the revision was received in time by the command to become effective and binding on the parties. *See United States v. Tolkach,* 14 MJ 239 (CMA 1982).

### Conclusions

29. No other regulations or provisions having apparent bearing on the accused's circumstances have been identified. I conclude, therefore, that he was within his right to submit his conscientious objector application to his commander in Germany—albeit it was invalid on its face.\* Arguably, his commander erred, however unwittingly, in informing the accused that the application would have to be resubmitted after deployment. Nevertheless, the command was clearly within its rights in ordering him to deploy. At the point when he refused to deploy, the command had certainly done nothing to compromise his espoused religious principles.

30. Admittedly, AR 600–43 provides certain timeliness standards for review of conscientious objector applications. The regulation also provides, however, that "[e]xtraordinary circumstances ... may lengthen this period." Para. 2–1b. Given the circumstances then in place in his unit, we assume the conditions for processing personnel applications (such as for conscientious objection) were far from maximal. In any event, his proper recourse for protesting delay in processing was administrative, not self-help. The Court of Military Review was mistaken in concluding that AR 600–43 and AR 614–30 conferred a right on this accused to refuse an order to deploy with his unit. Therefore, that court's action in setting aside the findings of guilty of missing movement and disobeying an order was error.

To the extent my reasoning conforms with the lead opinion, I concur outright. In any event, I concur in the result.

---

\* Para. 1–7a, AR 600–43, states:

[R]equests by personnel for qualification as a conscientious objector after entering military service will *not* be favorably considered when these requests are—

\* \* \*

(4) Based on objection to a certain war.

The accused's asserted religious beliefs, on the other hand, only forbad him from killing other Muslims, not from war in general. Also not lost is the irony that the United States' basis for military intervention in southwest Asia at the time was the invasion of one Muslim nation by another.